George S. **STENGER**, Plaintiff,

v.

**PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY,**
Defendant.

No. 99–C–643.

United States District Court,
E.D. Wisconsin.

Dec. 1, 2000.

**1240**

Allen C. Schlinsog, Jr., Kurt D. Dykstra, Milwaukee, WI, for Plaintiff.

Paul E. Benson, Matthew S. MacLean, Milwaukee, WI, for Defendant.

## ORDER

STADTMUELLER, Chief Judge.

Currently before the court in this action seeking reinstatement of cancelled insurance benefits are two motions: defendant's principal motion for summary judgment on preemption grounds, and defendant's alternative motion for partial summary judgment on the ground that the plaintiff failed to state a claim for bad faith termination of benefits.[1] For the following reasons, both motions will be denied.

## BACKGROUND

For many years plaintiff George Stenger maintained a general medical practice as a solo practitioner in New Berlin and Wauwatosa, Wisconsin. In order to provide himself with a stream of income should he become disabled, on August 12, 1971, Dr. Stenger contracted with defendant Provident Life and Accident Insurance Company ["Provident"] to establish an Accident and Sickness Insurance Policy ["the 1971 Policy"]. Pursuant to its terms, the 1971 Policy is to provide Dr. Stenger with a monthly disability benefit in the amount of $1000 beginning on the 91st day of total disability and lasting until Dr. Stenger reaches the age of 65. This policy defines "total disability" as "your inability to perform the duties of your occupation."[2] Effective on August 12, 1973, the 1971 Policy was amended to provide a higher monthly benefit for total disability—$2000 per month.

Apparently feeling the need for even more protection, Dr. Stenger entered into another contract with Provident for an Accident and Sickness Policy on December 29, 1975 ["the 1975 Policy"]. Pursuant to the 1975 Policy, Provident agreed to pay Dr. Stenger an additional monthly benefit of $1500 beginning on the 91st day of total disability and lasting until Dr. Stenger reaches age 65. The 1975 Policy defines "total disability" in the same way as the 1971 Policy.[3]

Effective on March 15, 1983, Dr. Stenger entered into a third contract for a Disability Income Policy with Provident ["the 1983 Policy"]. Pursuant to the 1983 Policy, Provident agreed to pay Dr. Stenger a monthly benefit in the amount of $5500 beginning on the 91st day of total disability and lasting until Dr. Stenger becomes 65. This Policy states that "Total disability" means that "1. You are not able

---

1. Two other motions related to this case, Provident's motion to strike portions of Dr. Stenger's memorandum of law in opposition to partial summary judgment, and Dr. Stenger's motion to seal the deposition of a witness, are addressed in separate orders.

2. The 1971 Policy also provided for benefits in the event of "partial disability." "Partial disability" was defined as "(a) your inability to perform one or more of your important daily business duties; or (b) your inability to perform your usual daily business duties for at least one-half of the time usually required for the performance of such duties ..."

3. Under the 1975 Policy, benefits also were available for "residual disability." This was defined to mean that due to injuries or sickness, "1. You are unable to perform one of more of your important daily business duties or you are unable to perform your usual daily business duties for as much time as is normally required to perform them; 2. Your loss of monthly income is at least 25% of your prior monthly income; and 3. You are under the care and attendance of a physician."

to perform the substantial and material duties of your occupation; and 2. You are under the care and attendance of a physician." [4] All three policies indicate that payments will only be made upon "due written proof" of loss.

At some point Dr. Stenger organized his practice as a corporation, Dr. George S. Stenger, D.O., Ltd. ["GSS"]. He was the sole shareholder of this business. During much of the lifetime of the three disability policies [collectively, "DI Policies"], GSS paid Dr. Stenger's premiums. Beginning in 1979, GSS began offering group health and life insurance to its employees, which also was paid for from the General Ledger of GSS.[5] This insurance was procured from the United Wisconsin Group and administered by American Medical Security ["AMS"]. Dr. Stenger obtained his health insurance through AMS, as did the up to eight nurses, assistants, and clerical personnel who came to work for him. Besides Dr. Stenger himself, none of GSS's employees received disability insurance, however.

By the early 1990s, Dr. Stenger's practice had become a great success. He counted 7000 people among his patients, operated a 4000 square foot office, and saw more than 60 patients daily. During the mid–1990s, though, Dr. Stenger began to experience physical and psychological problems. At times Dr. Stenger would fail to make hospital rounds or to honor appointments, refusing to accept telephone calls, admit visitors or leave his residence for days on end. Both his personal and professional life suffered as a result.

After extensive testing and treatment, mental health professionals diagnosed Dr. Stenger as suffering from manic depression with suicidal and homicidal ideation and bipolar depression. He was hospitalized for these psychiatric problems from October 25, 1996 to December 9, 1996. Shortly thereafter Dr. Stenger's physical health collapsed, as well. As a result, Dr. Stenger underwent both abdominal and carpal tunnel surgery in the fall of 1997. Dr. Stenger continues to complain of mental and physical problems including carpal tunnel syndrome, a bleeding duodenal ulcer, high blood pressure, a defect in the submuscular branch of the right coronary artery and Brady cardiac arrhythmia. Dr. Stenger has not practiced medicine since his hospitalization in 1996 and remains under the psychiatric care of Dr. Melvin Soo Hoo.

When Dr. Stenger became unable to practice medicine, he contacted the Social Security Agency ["SSA"] and Provident through his accountant, Bernard Mitby of Suby, Von Haden and Associates. Mr. Mitby was also GSS's accountant. The SSA determined that Dr. Stenger had a "condition" that totally disabled him from engaging in "any" type of work and awarded him monthly benefits effective beginning October 25, 1996.[6] On the private insurance front, Provident mailed Mr. Mitby a claim form and an occupational duties questionnaire on November 5, 1996. These forms were not returned to Provident until February 7, 1997. When they did arrive, the forms indicated that Dr. Stenger sought disability benefits under

---

4. The 1983 Policy provided benefits for "residual disability," as well. This policy stated, "We will consider you to be Residually disabled if due to Injuries or Sickness: 1. You are unable to perform one or more of your important daily business duties or you are unable to perform your usual daily business duties for as much time as is normally required to perform them; 2. You have a loss of at least 25% of your earnings just prior to disability; and 3. You are under the care and attendance of a Physician (other than you)."

5. It appears from the evidence that some employees may not have participated, however, and that GSS may not have paid the entire premium for every employee.

6. Presumably, the SSA took a great deal of time on its own investigation, which is not the subject of this lawsuit. The evidence suggests that the SSA did not reach a conclusion on Dr. Stenger's disability until April 1998. Provident notes that the SSA evaluates "conditions," while the DI Policies cover only "injuries" and "sickness."

the DI Policies due to a number of physical and mental impairments.

Upon receipt of Dr. Stenger's claim, it was assigned to Gregory Breter, a Claim Representative in the Disability Operations Department, and Provident began its investigation. On February 12, 1997, Provident wrote to Dr. Stenger to acknowledge receipt of his claim materials, and to inform him that the company was currently in the process of requesting medical records and treatment notes from some of the physicians and medical facilities listed on his claim forms. Provident also requested that Dr. Stenger complete a full questionnaire with regard to his claim for disability benefits. At the same time, Provident requested additional information from Dr. Stenger's Human Resources/Business Manager, his primary treating physician, and the Wisconsin Board of Medical Examiners. Also, a request for background information on Dr. Stenger was made to an organization called "Superbureau."

On March 3, 1997, Provident received medical records from Lakeview Hospital, Sinai Samaritan Hospital, James A. Thurow, and Milwaukee Psychiatric Physicians Chartered. Included in the materials from Milwaukee Psychiatric Physicians was the completed Physicians / Therapist Questionnaire from Dr. Soo Hoo. According to Dr. Soo Hoo, Dr. Stenger was totally disabled from his occupation due to a Bipolar Affective Disorder Type II.

Later in March Provident received medical records from Dr. Arthur Angove, additional medical records from Lakeview Hospital, and a preliminary response concerning its background check from Superbureau. On March 21, 1997, however, Provident contacted Dr. Stenger's assistant, Kathy, indicating that additional information was still required before a decision could be made on Dr. Stenger's claim.

On April 4, 1997, Provident received Dr. Stenger's responses to its questionnaire. Throughout this document, Dr. Stenger attributed his disability to problems he claimed to be experiencing mentally, as opposed to physical injuries or limitations.

After receiving additional information from Superbureau, Mr. Breter referred Dr. Stenger's claim to management on April 14, 1997. Based upon information currently in the claim file, Mr. Breter recommended that payment be issued to Dr. Stenger, but indicated that he would follow up with a field visit and an Independent Medical Examination ["IME"] at some future point. Accordingly, Provident issued Dr. Stenger a check in the amount of $18,000 for benefits due during the period 1/23/1997 to 3/23/1997, less the ninety-day elimination period. In the cover letter accompanying the check, Provident informed Dr. Stenger that under its policies, proof of disability was required on a monthly basis and, therefore, he would be required to submit supplemental forms with attending physicians' statements each month on or about the anniversary date of his claim.

Thereafter, from April 1997 to April 1998, Dr. Stenger submitted to Provident forms entitled "Insured's Supplementary Statement of Claim," which included an "Attending Physician's Statement." On every one of these forms, Dr. Soo Hoo was the only physician certifying Dr. Stenger's disability, though Provident received separate medical records from two doctors named Sadoughian and Robinson on June 17, 1997. On each "Attending Physician's Statement," Dr. Soo Hoo attributed Dr. Stenger's disability to a Bipolar Affective Disorder—Type II.

On September 12, 1997, Provident contacted Psychiatric Disability Consultants, Inc. ["PDC"] for the purpose of arranging an IME of Dr. Stenger. PDC scheduled an evaluation by a psychologist, Dr. Kenneth Smail, on November 25, 1997, and a psychiatrist, Dr. John Pankiewicz, on December 2, 1997. On November 4, 1997, Provident wrote Dr. Stenger to inform him that the company was exercising its right to have him examined by an Independent Medical Examiner.

On November 26, 1997, Provident received a telephone call from Dr. Smail in which he explained that Dr. Stenger had left him a message indicating that he would be unable to attend the IME as previously scheduled. On December 8, 1997, Dr. Smail confirmed that Dr. Stenger did not, in fact, show up for the scheduled examination. Three days later, Provident contacted an attorney representing Dr. Stenger, Bill Tobin, to inquire into the matter. Mr. Tobin indicated that Dr. Stenger had been traveling with his father but that he wished to re-schedule the IME.

On February 25, 1998, Provident finally received Dr. Stenger's IME results from Drs. Pankiewicz and Smail. Based upon his own evaluation of the records and a three-hour interview with Dr. Stenger, Dr. Pankiewicz opined that Dr. Stenger's major depression was in remission, though he continued to suffer from an unspecified personality disorder, and that Dr. Stenger could return to limited medical practice with a group or outpatient clinic (but not as a solo practitioner). He concluded that, "[t]his will certainly be a new experience for him and may be difficult for him given the length of his independent practice, but . . . the barriers to this work are Dr. Stenger's preferences and not a medical condition."

After interviewing Dr. Stenger and reviewing his medical records,[7] Dr. Smail reached much the same conclusions as Dr. Pankiewicz. Dr. Smail wrote Provident, stating, "The available data does not indicate that Dr. Stenger has a totally disabling psychiatric condition. He may be under the influence of a personality disorder, but his essential psychological processes are not compromised in a manner that would preclude his adaptive functioning. Moreover, he retains the capacity to engage in the substantial material duties of his occupation. His current impairments arise from his personality disorder and patterns of behavior acquired during his periods of marital conflict and subsequent depression."[8]

Mr. Breter forwarded the IME reports of Drs. Pankiewicz and Smail to Michelle Jackson, who summarized the reports and concluded that they did not indicate the existence of a "total disability" as defined in Dr. Stenger's DI Policies. She did not evaluate the appropriateness of the IME doctors' diagnostic methodologies, however, or pass any opinion on their reliability.

On March 2, 1998, Mr. Breter referred Dr. Stenger's claim to his supervisor Arlene Davidson with a recommendation that it be closed. Based upon the results of the IMEs and the contents of the claim file, Ms. Davidson concluded that Dr. Stenger's disabling condition was in remission, later claiming that she did so based on "objective" evidence. Thus, she elected on behalf of Provident to bring the payments on Dr. Stenger's claim current and to discontinue any future benefits on a going forward basis. Provident wrote to Mr. Stenger and his lawyer informing them of its decision and inviting them to submit additional materials in the event they felt Provident had not considered "all applicable information." Dr. Soo Hoo also was informed of the decision and provided with copies of the reports of Drs. Pankiewicz and Smail.

7. Dr. Smail also conducted three psychological tests on Dr. Stenger. The first two came back with unusable results, while the third, the "Wechsler Memory Scale–Revised," had "little to add" to Dr. Smail's diagnosis. In fact, all Dr. Smail was able to conclude from this third test is that Dr. Stenger's "degree of impairment . . . is unlikely to interfere with common tasks."

8. Neither doctor addressed the specific issue of whether Dr. Stenger could return to performing surgery, however, which he had listed as a duty of his employment on his insurance application forms. Testimony from various claims processors at Provident suggest a level of confusion over what the "substantial and material duties" addressed by Dr. Stenger's DI Policies actually were. Indeed, neither James Catlett, Provident's "in-house clinician," nor Arlene Davidson, who made the final decision to terminate benefits, was aware that Dr. Stenger performed surgery.

On March 18, 1998, Provident received correspondence from Dr. Stenger's attorney indicating that the doctor was appealing the company's decision to discontinue disability benefits. The next day, Dr. Soo Hoo telephoned Provident inquiring whether he could release copies of the IME to Dr. Stenger's other treating physicians. Provident consented. Less than one month later, Dr. Soo Hoo wrote Provident reasserting his previous position that Dr. Stenger did, indeed, suffer a total disability. This correspondence was forwarded to Drs. Pankiewicz and Smail, who informed Provident that they did not feel the need to revise their diagnoses, despite Dr. Soo Hoo's supplemental materials.

In June 1998, Provident sought and received additional materials from a doctor named Engel. Also, Dr. Stenger's attorney forwarded some materials from the SSA to Provident. On July 14, 1998, Provident received what Dr. Stenger's attorney represented to be a complete copy of the Social Security Disability file regarding Dr. Stenger. That same day, Provident confirmed receipt of these materials, and forwarded them to Drs. Pankiewicz and Smail for further review.

On August 6 and 7, 1998, Provident received comments from doctors Smail and Pankiewicz, respectively. Both indicated that the additional information did not cause either to undo or change his opinion. Accordingly, Provident closed Dr. Stenger's file once again.

On August 10, 1998, however, Dr. Stenger's attorney submitted a psychological report from Dr. Michael Kula. This report was based on over a dozen psychological tests and concluded that Dr. Stenger was not able to "competently perform his professional activities as either a sole/independent practitioner or as part of a group clinic." Provident forwarded this material, too, to Drs. Pankiewicz and Smail. Dr. Pankiewicz informed the company on September 2, 1998, that he was still of the opinion that there was no objective medical data to support the proposition that Dr. Stenger suffers from an active major mental illness that impairs his ability to materially function in his occupation as a family practitioner. Dr. Smail, however, expressed a desire to review the materials from which Dr. Kula drew his conclusions before issuing another opinion.

Dr. Smail received the requested data in September 1998. After reviewing the material, Dr. Smail wrote on October 8, 1998, that the additional information did not "subtract from or add to the conclusions previously expressed by me." Specifically, he expressed doubt that the tests administered by Dr. Kula were particularly useful in a forensic, as opposed to a clinical, setting. While he later admitted that tests exist that might have been more helpful in such a forensic setting, neither he nor anyone else associated with Provident requested that any additional testing be done on Dr. Stenger.

Following Dr. Smail's review, the entire file relating to Dr. Stenger was forwarded to Provident's "in-house clinician," Mr. James Catlett (a non-doctor). He concluded that the views of Drs. Pankiewicz and Smail were supported by a coherent rebuttal of opposing findings, later stating that the data provided by the IMEs "seemed more sound" than the opposing data. As such, on October 13, 1998, Provident advised Dr. Stenger's attorney that there would be no change in the disposition of Dr. Stenger's claim. At no time did Provident investigate Dr. Stenger's physical maladies, aside from ordering and reviewing medical records.[9]

---

9. The court notes that Dr. Stenger did not undergo carpal tunnel surgery until ten months after he filed his initial claim for disability benefits and did not discuss his physical problems in his April 4, 1997 questionnaire, so Provident may not have understood Dr. Stenger to be making a claim for these ailments. Dr. Stenger, however, has directed the court's attention to his Feb 7, 1997 claim form in which he does specifically complain of "Chest pain—inferior wall ischemia, gastrointestional [sic] ulcer, ... [and] bilateral carpal tunnel," as well as his mental illness. Dr. Stenger's surgeon, Dr. Yoder, has testified that due to decreased strength in his hands, Dr. Stenger is currently completely unable to perform surgery.

Dissatisfied with the denial of benefits, Dr. Stenger contacted the Wisconsin Commissioner of Insurance to complain about Provident's handling of his case. On November 20, 1998, Provident received correspondence from that office requesting a response to Dr. Stenger's complaint. After receiving correspondence from Provident,[10] the Commissioner of Insurance wrote Dr. Stenger on March 1, 1999, indicating that the office did not have the authority "to resolve disputes involving differences of opinion between medical professionals, nor can we make a judgement [sic] on questions of total disability . . . .".

On May 4, 1999, Dr. Stenger brought suit in Waukesha County Circuit Court, asserting state law claims for declaratory judgment, breach of contract, and bad faith. In response to Dr. Stenger's complaint, Provident removed the lawsuit to this court on June 9, 1999, claiming diversity jurisdiction.[11] As a result of the further interviews and testing performed during the discovery period, Drs. Pankiewicz and Smail have since come to the conclusion that Dr. Stenger is, in fact, unable to perform the substantial and material duties of his occupation. Considering additional review and examination necessary to determine the cause of his disability, however, Provident has persisted in its refusal to award Dr. Stenger benefits. Dr. Stenger has retained a former insurance executive as an expert. This expert is willing to testify that Provident's handling of Dr. Stenger's case is a "clear case" of unreasonable conduct and bad faith.[12]

On April 7, 2000, Provident filed a motion for summary judgment, claiming that Dr. Stenger's state-law claims are preempted by ERISA and therefore must be dismissed. Also on April 7, 2000, Provident filed an alternative motion for partial summary judgment, claiming that Dr. Stenger can present no facts to support his claim for bad faith termination of benefits. Both motions are now fully briefed and ready for resolution by the court.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

Only "genuine" issues of "material" fact will defeat an otherwise proper motion for summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[M]aterial facts are those facts which, under the governing substantive law, might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over such material fact is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The trial court's function at this juncture is to determine whether there is a genuine issue for trial—not to weigh the evidence and determine the truth of the matter. *See id.* at 249–50, 106 S.Ct. 2505.

**10.** It is worth noting that this correspondence stated, falsely, that Dr. Stenger had never made a claim for disability benefits based on his carpal tunnel problems.

**11.** Provident also claimed federal question jurisdiction on the grounds that Dr. Stenger's DI Policies were part of an "employee welfare benefit plan" governed by the Employee Retirement Income Security Act of 1974 ["ERISA"], 29 U.S.C. § 1001, *et. seq.* As the court determines that Dr. Stenger's DI Policies are not governed by ERISA, however, *see*

discussion *infra,* the only available basis for federal jurisdiction is diversity. *See* 28 U.S.C. §§ 1332 and 1441.

**12.** This expert's beliefs seem to be based as much on what he claims to know about Provident in general, as opposed to what he knows about the handling of Dr. Stenger's actual claim, however. Whether this testimony is relevant at all is the subject of a motion *in limine,* which will be addressed by the court in a separate order.

The moving party has the burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law by informing the court of the portions of the record or affidavits that demonstrate an absence of a triable issue. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may meet its burden by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## DISCUSSION

### i. ERISA PREEMPTION

In his complaint, Dr. Stenger sets forth five causes of action: (1) declaratory judgment that he is totally disabled; (2) breach of contract of the 1971 Policy; (3) breach of contract of the 1975 Policy; (4) breach of contract of the 1983 Policy; and (5) bad faith denial of benefits. Clearly, none of these claims is cognizable under ERISA. For his lawsuit to have any chance of success, then, the court must determine that Dr. Stenger's underlying insurance policies are not governed by the federal legislative scheme. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56–57, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (explaining that if an insurance policy is part of an employee welfare benefit plan governed by ERISA, then a plaintiff's state law claims relating to that policy are preempted).

As Provident quite rightly points out, almost all employment-related benefit plans fall within the scope of ERISA. Not all do, however. Those plans that do not fit the definition of "employee benefit plan" codified in 29 C.F.R. § 2510.3–3 are governed not by the federal laws, but by those of the states.

29 C.F.R. § 2510.3–3(b) states, "the term 'employee benefit plan' shall not include any plan, fund or program . . . under which no employees are participants covered under the plan[.]" Subsection (c) of that regulation further explains that "[a]n individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether incorporated or unincorporated, which is wholly owned by the individual[.]" [13]

■ When the factual circumstances are undisputed, as they are on this issue, whether the facts suffice to demonstrate the existence of a plan as defined by ERISA is a question of law to be determined by the court. *See Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir.1993). Here, Dr. Stenger was the sole shareholder of GSS. Prior to 1979 no other employees received any benefits of any kind from the corporation. Thus, there can be no question that before that date, the two DI Policies carried by Dr. Stenger were not part of an "employee benefit plan." The questions faced by this court are whether the 1971 and 1975 Policies became part of an "employee benefit plan" after 1979, and whether the 1983 Policy ever was part of such a plan. The court believes the answers to these questions to be "no."

**13.** While creating an ERISA exemption for policies held solely by company owners might seem to conflict with ERISA's goal of "eliminating the threat of conflicting or inconsistent State and local regulation" of benefit plans, *Pilot*, 481 U.S. at 46, 107 S.Ct. 1549, it is worth remembering that the whole purpose of ERISA is to protect *employees*. Employers have been deemed capable of protecting themselves. *See In re: Watson*, 161 F.3d 593, 598 (9th Cir.1998) (citing Congressional record). Indeed, the anti-inurement provision of ERISA, 29 U.S.C. § 1103(c)(1), states that employers are not to benefit from the assets of an ERISA plan at all. This court finds the sole owner exemption established by the Department of Labor Regulations "reasonably defensible" and not inconsistent with ERISA. *Cf. Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 891, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (referencing definition of "employee" by National Labor Relations Board).

Just last year, the Eleventh Circuit Court of Appeals had the opportunity to evaluate a situation almost identical to the one at bar. In that case, *Slamen v. Paul Revere Life Insurance Company*, 166 F.3d 1102 (11th Cir.1999), a dentist acquired a disability benefit plan for himself four years after he acquired unrelated health insurance for himself and his employees. The court thus had to determine whether the two types of insurance should be considered jointly as one larger "plan" for ERISA purposes. Looking at the fact "the two policies were purchased at different times, from different insurers, and for different purposes," the court determined that there were two "plans" present, not one. *See Slamen*, 166 F.3d at 1105. The court concluded by stating that absent evidence that such separate plans are related, it would be folly to deem an otherwise non-ERISA policy to be transformed into an ERISA one by the mere presence of a separate federally-governed insurance program.[14] *Id.* at 1106.

The Eleventh Circuit was in good company when it decided *Slamen*. The Fifth Circuit previously had ruled that separate policies are to be analyzed separately, as had the Ninth. *See Robertson v. Alexander Grant & Co.*, 798 F.2d 868, 871–72 (5th Cir.1986) (the insurance company's "argument ignores the fact that the plans, however similar, are two separate plans"); *In re Watson*, 161 F.3d 593, 595 (9th Cir. 1998). Since then, the Federal District Court for the Eastern District of New York has joined the chorus by stating that "the plaintiff's disability insurance policies, which are not covered by ERISA, are not converted into an ERISA plan merely because the plaintiff's employees received unrelated health insurance," *Rand v. Equitable Life Assurance Society of United States*, 49 F.Supp.2d 111, 118 (E.D.N.Y. 1999), and the Sixth Circuit Court of Appeals has expressed approval of the con-

cept. *See Agrawal v. Paul Revere Life. Ins. Co.*, 205 F.3d 297, 301 (6th Cir.2000).

Provident's attempts to distinguish this line of cases is unconvincing. First, Provident tries to paint *Slamen* as inconsistent with *Kuehl v. Provident Life & Accident Insurance Company*, No. 97–C–1021, a case decided by another judge in this district in which a disability policy was considered part of a larger ERISA "plan." Such painting is *trompe l'oeil*, however. In *Kuehl*, an employee received disability insurance as part of a program that offered a menu of insurance options to a number of employees. The court looked at the resulting insurance policy both as part of a larger "plan" (as was justified under the circumstances by the fact all the policies were offered to employees at the same time as part of a larger program), *and separately*, and determined that in either case the policy was part of an ERISA "plan." The facts of *Kuehl* are not those encountered here, or in any of the cases cited above.

Provident next tries to claim that the *Slamen* line of cases is inconsistent with *Peterson v. American Life & Health Insurance Company*, 48 F.3d 404 (9th Cir. 1995). The facts in that case also are a far cry from those encountered here. In *Petersen*, the owner of a business (George Peterson) acquired health insurance for himself, his partner, and their one employee. The co-partner and the employee later switched to a different insurance plan, but Mr. Peterson retained the original insurance. When he later sought to collect under the policy, he argued that his once ERISA-governed policy had been converted into a non-ERISA policy by the departure of the employee. Relying on the long line of cases barring such conversion, the court rejected his attempts, stating that the policy remained a part of the original

14. The court notes that the present case is in some ways easier than *Slamen* in that here the federally-regulated health insurance plan was purchased AFTER two of the non-ERISA disability policies. In *Slamen* the fact the non-ERISA disability policy was purchased when an ERISA plan was already in existence might have led the court to consider the disability plan an "addition" to the already-existing plan, but it declined to do so.

ERISA "plan." *See Peterson,* 48 F.3d at 408.

That the Ninth Circuit does not believe *Peterson* stands for the proposition that separate policies should always be considered part of the same "plan" if offered by the same employer is borne out by its later decision in *In re Watson,* cited *supra.* If anything, *Peterson* stands for exactly the opposite proposition Provident tries to establish for it: Logically, if an ERISA plan cannot be converted into a non-ERISA plan by the departure of an employee, neither should a non-ERISA plan be convertible into an ERISA plan by the later arrival of employees (especially when those employees participate in a different policy purchased at a different time for a different purpose). *See also, Zeiger v. Zeiger,* 131 F.3d 150 (9th Cir.1997) ("A non-ERISA plan is not converted into an ERISA plan merely because an employer also sponsors a separate benefits plan subject to ERISA").

Finally, Provident tries to argue that the *Slamen* line of cases comes up against *Bellisario v. Lone Star Life Insurance,* 871 F.Supp. 374 (C.D.Cal.1994). While the court in that case did find a company owner's disability insurance to be part of an ERISA plan, it did so only after finding that the policy was intended to be part of the company's greater employee benefit plan. A significant factor leading to this finding was a written memorandum of understanding, in which the owner acknowledged that the policy was "part of a formal Wage Continuation Plan." Here, there was no such memorandum of understanding, or any other evidence that Dr. Stenger's disability insurance was intended to be considered part of an employee welfare benefit plan.[15]

The rest of the cases Provident cites stand for irrelevant propositions, *see, e.g., In Matter of Baker,* 114 F.3d 636 (7th Cir.1997) (a sole shareholder may be considered an "employee" of his corporation); *Brundage–Peterson v. Compcare Health Services Ins. Corp.,* 877 F.2d 509 (7th Cir. 1989) (a single ERISA plan may offer policies from multiple insurers), or for the proposition that a sole shareholder has standing to bring an ERISA claim, *see, e.g., Metropolitan Life Ins. Co. v. Kagan,* No. 96–C–1199 (E.D.Wis.1997) (citing *Matter of Baker,* 114 F.3d 636, 639 (7th Cir. 1997)). While the court agrees that if Provident had shown that an ERISA plan existed, Dr. Stenger would have standing to bring an ERISA claim, *see id.,* Provident has not convincingly demonstrated the existence of an ERISA plan.

Instead, following the *Slamen* line of cases, the court determines that the 1971 and 1975 Policies were not converted into ERISA policies by GSS's later offering health insurance to its employees. Furthermore, the 1983 Policy was never part of an ERISA plan because it was purchased at a different time, from a different insurer, and for a different purpose than the ERISA-governed health insurance offered to GSS's employees. Accordingly, Dr. Stenger's state law claims are not preempted by ERISA, and Provident's principal motion for summary judgment must be denied.

## ii. BAD FAITH

Dr. Stenger advances four separate arguments in support of his contention that Provident discontinued his disability benefits in bad faith. While the viability of his bad faith claim is admittedly a close question, the court believes that at least two of

---

**15.** Provident asserts that the fact GSS made most of Dr. Stenger's premium payments and took a tax deduction for those payments at the same time it paid, and took deductions for, employee health insurance indicates that the DI Policies were intended to be part of an overall employee welfare benefit plan. The *Slamen* court was unconvinced by these fac-

tors, *see Slamen,* 166 F.3d at 1103–1104, as am I. Absent evidence that the same or similar benefits were offered to Dr. Stenger's employees, the court is unwilling to infer the existence of an employee welfare benefit plan simply from the quite logical (and legal) deductions the company took for the financial protection of its sole income-generator.

these arguments present questions of fact that can only be resolved by a jury.

■ In Wisconsin, an insured can sue his insurer for the tort of bad faith if the insurer has with knowledge or reckless disregard for the wrongfulness of its actions refused to honor the insured's claim.[16] See generally, Anderson v. Continental Ins. Co., 85 Wis.2d 675, 271 N.W.2d 368 (1978). The tort of bad faith has its roots in the special duty of fair dealing and good faith owed by the insurer to its insured by virtue of the insurance contract. See id. at 687–89, 271 N.W.2d 368. Accordingly, the guideline is that the insurer must conduct a neutral, detached investigation and exercise the same standard of care as if the insurer were exercising ordinary diligence in its own affairs. See Benke v. Mukwonago–Vernon Mutual Ins. Co., 110 Wis.2d 356, 364–65, 329 N.W.2d 243 (Ct.App.1982).

■ In order to prove a claim of bad faith, an insured must show: (1) the absence of any reasonable basis by the insurer for denying the benefits of the policy to the insured; and (2) the insurer's knowledge or reckless disregard for the lack of a reasonable basis for denying the claim.

See Anderson, 85 Wis.2d at 691, 271 N.W.2d 368. A court must determine both whether a reasonable insurer under the particular circumstances would have denied or delayed payment of a claim, as well as whether the insurer recklessly disregarded a lack of a reasonable basis for the insurer's denial of a claim or proof submitted by the insured. See Benke, 110 Wis.2d at 362, 329 N.W.2d 243.

■ The courts have defined bad faith as the knowing failure of an insurer to exercise an honest, intelligent, and informed judgment as to any claim submitted by an insured. See Anderson, 85 Wis.2d at 692, 271 N.W.2d 368. However, when an insurer exercises its duty of ordinary care and reasonable diligence in investigating and evaluating claims and determines that a claim is "fairly debatable," the insurer is entitled to debate and/or litigate the claim if it feels that there is a question of law or fact which must be decided before the insurer, in good faith, is required to pay. See id. at 693, 271 N.W.2d 368. In such a situation there can be no bad faith. See id.[17]

16. Following the familiar rule of Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the court applies the law of the State of Wisconsin to Dr. Stenger's substantive claims.

17. This case law is summarized in Wisconsin Civil Jury Instruction 2761, "Bad Faith by Insurance Company: Assured's Claim," which states:

To prove bad faith against (insurance company) the (plaintiff) must establish that there was no reasonable basis for the insurance company's denying (plaintiff)'s claim for benefits under (his)(her) policy and that (insurance company), in denying the claim, either knew or recklessly failed to ascertain that the claim should have been paid.
Bad faith on the part of an insurance company toward its insured is the absence of honest, intelligent action or consideration of its insured's claim.
Bad faith exists if, upon an examination of the facts found by you, you are able to conclude that (defendant) had no reasonable basis for denying (plaintiff)'s claim.

In answering this question, you may consider whether (plaintiff)'s claim was properly investigated and whether the results of this investigation were given a reasonable evaluation and review. If you find that (insurance company) either refused to consider the (plaintiff)'s claim for damages, made no investigation, or conducted its investigation in such a way as to prevent it from learning the true facts upon which the (plaintiff)'s claim is based, the insurance company can be found to have exercised bad faith. This is because you may infer from these facts a reckless disregard on the insurance company's part to learn that there was no reasonable basis for it to deny (plaintiff)'s claim.
If, on the other hand, you find that the insurance company, after conducting a thorough investigation of the facts and circumstances giving rise to the (plaintiff)'s claim, reasonably concluded that the claim is debatable or questionable, then there is no bad faith even though it refused to pay the claim.

■ Dr. Stenger argues, first, that he was entitled to benefits and that Provident denied them to him improperly and in bad faith because it did not undertake any testing to determine whether he was disabled or not. The one reliable test administered by Provident indicated only that Dr. Stenger's cognitive (dis)abilities would not interfere with his ability to do "common tasks." As Dr. Stenger quite rightly points out, doctors are required to do much more than "common tasks." He finds Provident's lack of testing especially egregious in the face of the over twelve tests that his own doctors performed. He finds it incredible that Provident's one test—which only showed Dr. Stenger's ability to do common tasks—could be deemed "more sound" by Provident's clinician James Catlett than his own multiple tests.

Dr. Stenger hypothesizes that once the company possessed something that could colorably be used to deny him benefits— the subjective interview-based impressions of Drs. Pankiewicz and Smail—that the company became unwilling to undertake any additional investigation that might prove the doctors wrong.[18] In his opinion, this is not the kind of "neutral, detached" investigation that Wisconsin law requires. *See Benke,* 110 Wis.2d at 364–65, 329 N.W.2d 243.

Provident, for its part, argues that regardless of the quality of its investigation, it was in the possession of written opinions from two doctors (whose credibility has never been questioned) indicating that Dr. Stenger was *not* disabled, and that, therefore, the question of Dr. Stenger's entitlement to benefits must be "fairly debatable." In support of its position, the company cites to *Samuels Recycling Company v. CNA Insurance Companies,* 223 Wis.2d 233, 247–48, 588 N.W.2d 385 (Ct. App.1998), where the court notes that before reaching the question of whether an investigation was reckless or not, the plaintiff must present evidence that the denial of benefits did not have a reasonable basis. *Samuels* does not get to the heart of this issue, however. In that case, the primary question was whether, under Wisconsin law, environmental cleanup costs are covered under standard-form general liability insurance plans. At the time *Samuels* was litigated, that issue was unresolved, so whether benefits were due *was* "fairly debatable." That the defendant in that case raised other defenses that may have been based on a faulty investigation was therefore irrelevant.

Provident also invites the court's attention to *Mills v. Regent Insurance Company,* 152 Wis.2d 566, 575–76, 449 N.W.2d 294 (Ct.App.1989), which concludes:

> [T]o permit recovery against an insurer because of flaws in the investigation even though the insurer has, in fact, an objectively reasonable basis for denying coverage ... would be to remove most of the protection for insurers and premium payers announced in *Anderson* since it is almost impossible to conduct an investigation as to which some question of adequacy, sufficient to get to the jury, cannot, in hindsight, be raised. Thus if there is an objectively reasonable basis to deny coverage, existence of investigative flaws, standing alone, are not enough to permit recovery in tort against an insurer ....

(internal citation omitted). This case, too, slightly misses the mark, as Dr. Stenger has asserted that there was *no* objectively reasonable basis for Provident to deny his claim.

■ Viewing the evidence in the light most favorable to Dr. Stenger (the nonmovant), the only evidence in Provident's file indicating that he is not disabled is the pre-2000 opinions of Drs. Pankiewicz and Smail—opinions that Dr. Stenger asserts do not have reasonable bases. As Wisconsin case law makes clear, an insurer may

18. This hypothesis might gain strength from the fact that once additional testing *was* done during the discovery period, Provident's two doctors did come to the conclusion that Dr. Stenger is, indeed, disabled.

not rely on an expert's opinion if the opinion is unreasonable and the company has done nothing to determine its reasonableness. *See Fehring v. Republic Ins. Co.,* 118 Wis.2d 299, 313, 347 N.W.2d 595 (1984). As the entire purpose of the Wisconsin bad faith rule is to force insurers to properly investigate the facts necessary to evaluate insurance claims, *see Anderson,* 85 Wis.2d at 691, 271 N.W.2d 368, the court is doubtful that a Wisconsin court would deem the simple existence of doctors' opinions preclusive of the possibility of a successful bad faith claim where the plaintiff alleges that those doctors' opinions were neither reasonable nor critically evaluated. *See Schlussler v. American Family Mutual Ins. Co.,* 157 Wis.2d 516, 528, 460 N.W.2d 756 (Ct.App.1990) ("American Family argues that when it relies on a medical opinion, no matter how unreasonable, it is protected from any claim of bad faith. We do not agree").

Since Dr. Stenger has an insurance industry expert willing to testify that a reasonable insurance company would have performed more tests before denying the doctor's claim, and it would be reasonable (though not by any means necessary) for a juror to conclude that the refusal to perform more tests was a conscious decision made by Provident in order to avoid payment, the court cannot say that Provident is entitled to judgment as a matter of law. This is especially so because one might expect the insurance company to have conducted a more thorough investigation were its own interests on the line. *See Prosser v. Leuck,* 225 Wis.2d 126, 138, 592 N.W.2d 178 (1999) ("The fiduciary duty 'carries with it the duty to act on behalf of the insured and to exercise the same standard of care that the insurance company would exercise were it exercising ordinary diligence in respect to its own business.'") (quoting *Alt v. American Family Mutual Ins. Co.,* 71 Wis.2d 340, 348, 237 N.W.2d 706 (1976); *see also Weiss v. United Fire and Casualty Co.,* 197 Wis.2d 365, 383, 541 N.W.2d 753 (1995) (reinstating a jury finding of bad faith where "[t]he crux of the plaintiff's position is that [the insurer]'s incomplete and slipshod investigation of the claim prevented it from learning the true facts on which the plaintiff's claim was based").

In light of the above discussion, which precludes judgment for Provident, Dr. Stenger's next three arguments in support of his bad faith claim need be given only cursory attention. The heart of Dr. Stenger's second argument is that Provident did not critically review the opinions of Drs. Pankiewicz and Smail. He specifically cites testimony from Ms. Jackson to this effect, and points to the fact that neither Ms. Davidson or Mr. Catlett knew that one of the duties of his employment was surgery, as evidence of the lack of a critical review. As the Wisconsin Supreme Court specifically stated in *Anderson* that "[i]t is appropriate, in applying the test, to determine . . . whether the results of the investigation were subjected to a reasonable evaluation and review," 85 Wis.2d at 692, 271 N.W.2d 368, and the Wisconsin Court of Appeals has suggested that lack of knowledge of claim standards can be bad faith, *see Poling v. Wisconsin Physicians Service,* 120 Wis.2d 603, 607–608, 357 N.W.2d 293 (Ct.App.1984), the court is inclined to agree that the reasonableness of Provident's review also presents an issue of fact for the jury. *See also, Fehring,* 118 Wis.2d at 313, 347 N.W.2d 595 (finding bad faith where the insurer did not subject the results of an expert's opinion "to a reasonable evaluation and review").

Dr. Stenger next asserts that Provident's lack of investigation of his physical ailments demonstrates bad faith. The court cannot agree with this argument. Provident has submitted evidence that Dr. Stenger did not provide it proof of his physical problems, as was required by his DI Policies. Dr. Stenger has not pointed the court to evidence that refutes this proposition, as he must in order to avoid summary judgment on this point. *See Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348. As an insurance company is not required to provide benefits for alleged

**1252**

injuries on which there has been no submission of proof, *see Davis v. Allstate,* 101 Wis.2d 1, 7, 303 N.W.2d 596 (1981), the failure of Provident to investigate Dr. Stenger's physical problems cannot form the basis of a bad faith claim.

Finally, Dr. Stenger has alleged that Provident's claims policy of requiring "objective" evidence of disability constitutes a bad faith plan to deny benefits to sufferers of more "subjective" maladies such as mental illness. As the court has made clear on previous occasions, it is uncomfortable with this theory inasmuch as it relates to Provident's general policies and not to the handling of Dr. Stenger's actual claim. Provident has indicated that it intends to file a motion *in limine* addressing this particular theory of recovery. Therefore, the court will withhold judgment on whether to permit evidence on this point until the specific issue is more fully briefed. Of course, while the court may eventually decide to exclude evidence on this one particular point, Dr. Stenger is nonetheless free to proceed with his bad faith claim in general.

### CONCLUSION

For the reasons stated above, defendant Provident Insurance Company's principal motion for summary judgment due to state law preemption will be denied, as will its alternative motion for partial summary judgment on the grounds that the plaintiff cannot state a claim for bad faith.

Accordingly,

**IT IS ORDERED** that defendant's motion for summary judgment be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that defendant's alternative motion for partial summary judgment be and the same is hereby **DENIED**.